OPINION *Page 2 
{¶ 1} Plaintiff-Appellants, Kevin J. Moeller, Diane M. Moeller, and Bruce J. Moeller, appeal the judgment of the Auglaize County Court of Common Pleas granting summary judgment in favor of Defendant-Appellees, Auglaize Erie Machine Company, Textron, Inc., Jacobsen Division of Textron, Inc., and Steiner Turf Equipment, Inc. On appeal, the Moellers contend that the trial court erred in granting summary judgment because genuine issues of material fact existed. Based upon the following, we affirm the judgment of the trial court.
 {¶ 2} In June 2007, Kevin Moeller and his parents, Diane and Bruce Moeller (collectively referred to as the "Moellers"), filed a complaint against Auglaize Erie Machine Company ("AEM"), Textron, Inc., Jacobsen Division of Textron, Inc., and Steiner Turf Equipment, Inc. (Textron, Inc., Jacobsen Division of Textron, Inc., and Steiner Turf Equipment, Inc. collectively referred to as "Textron," and Textron and AEM jointly referred to as "Appellees"). The complaint arose from an incident during which Kevin, during the course of his employment at Manco Manufacturing, Inc. ("Manco"), was pinned by the wing deck of an industrial mower, causing him to be paralyzed from the waist down. The Moellers' complaint alleged that Appellees were liable for Kevin's injuries because the mower was defective in design; because the mower was defective due to inadequate warnings; because the mower deviated from design specifications; and, because Appellees were negligent. Additionally, the Moellers' complaint *Page 3 
alleged that Appellees were liable for Diane's and Bruce's loss of consortium with Kevin.
 {¶ 3} In June 2007, AEM filed an answer to the Moellers' complaint, alleging multiple defenses, including, in part, that the mower had not been placed into the stream of commerce; that Kevin's negligence was the sole and proximate cause of his injuries and the resulting damages; that Kevin assumed the risk of his injuries; and, that misuse or abuse of the mower caused Kevin's injuries.
 {¶ 4} In July 2007, Textron filed a joint answer to the Moellers' complaint, alleging multiple defenses, including, in part, that Kevin's negligence was the proximate cause of his injuries; that Kevin's injuries were the result of an unforeseeable condition; that the mower was modified and the modifications significantly contributed to the damages; that Kevin and other individuals misused or abused the mower in an unintended and unforeseeable manner; that it owed no duty to the Moellers; and, that the mower was not completed or placed into the stream of commerce.
 {¶ 5} In January 2008, Kevin was deposed and testified that, in January 2004, he was employed at Manco; that he had never before worked on an industrial mower like the RM-22; that the RM-22 was an industrial mower with a frame, two seven-foot long wing decks, and a rear deck; that, when the wing decks were in the "upright position," they were upright at a ninety degree angle and connected to the frame with a latch to hold them in place during traveling; *Page 4 
that he did not recall seeing a hydraulic cylinder between the frame and the wing decks; that both wings on the mower were in the upright position, and his supervisor, Patrick Nieberding, attached a rope to one of the wings; that Nieberding did not throw the rope over an overhead bar or anything else to reduce the tension on the rope; that Nieberding instructed Kevin and Eric, Nieberding's son and Manco employee, to lower both of the wings in order to touch up the paint; that Nieberding instructed him and Eric to stand underneath either side of the wing to slowly lower it down by hand while he held the rope to assist in lowering; that the three men did not discuss how heavy the wing would be; that he and Eric lowered the right wing to chest level, and then "it dropped down" and they "both got out of the way"; that the wing was heavy, but that it was not difficult to control and he could not estimate its weight; that the three men then began to lower the left wing using the same method; that, as they lowered the wing to chest level, he and Eric both began to struggle, lost control of the wing, and then "it came down"; that Eric was able to jump out of the way, but his [Kevin's] abdomen and legs became pinned under the wing; that Eric obtained a forklift to lift the wing and someone called for help; and, that, as a result of the accident, he is paralyzed from the waist down.
 {¶ 6} Nieberding testified that he owns Manco and employed Kevin in January 2004; that Manco's job was to paint mower parts for AEM, including the RM-22 mower; that the particular mower involved in the accident was delivered *Page 5 
to Manco from AEM for paint touch-up; that Jeremy Homan, of AEM, told him generally that AEM was "selling a new unit [that was] weathered" and requested that he touch up the paint so that it could "be brought to a dealer to be sold" (Nieberding dep., p. 23); that, to his understanding, the mower had never been delivered to a dealer or a customer; that Manco was not intended to be the "end user" of the mower, was not purchasing the mower, and never intended to use it as a mower; that the mower was delivered to Manco in the upright position, meaning that the wing decks were up and locked into position; that he knew this model of mower was designed so that hydraulic power would raise and lower the wings; that, in order for the hydraulic cylinder to operate, the mower must be connected to a power source on a tractor; that, for transport purposes, the mower contained a safety latch that supported the weight of the wings in addition to the hydraulic cylinder; that, when the mower was transported into the Manco shop, it was not connected to a tractor; and, that Manco had no tractor that could have operated the hydraulic unit on the mower.
 {¶ 7} Nieberding continued that he decided to lower the wings manually with Eric's and Kevin's assistance in order to touch up the paint; that he did not know the exact weight of the wings; that he had never handled a fully assembled RM-22 mower; that the hydraulic cylinder would not release any pressure to allow him to lower the wing decks manually, so he disconnected the cylinder and disengaged the safety latch; that the wing still would not descend, so the three *Page 6 
men pushed it or nudged it to get it moving; that they successfully lowered the right wing using this method; and, that, while lowering the left wing using the same method, Kevin became pinned underneath the wing.
 {¶ 8} Jeremy Homan testified that, in 2004, he was a sales representative for AEM; that AEM makes parts in accordance with customer blueprints; that AEM does not create any of its own products; that he was the "project manager" of the RM-22 project at AEM; that AEM produced parts for and assembled RM-22 mowers from late 2003 until 2005 for Textron; that Textron would provide AEM with all specifications, assembly instructions, and manuals for the mower; that, after producing the parts and assembling the mowers, AEM would then "sell them back" to Textron; that AEM does not have a paint shop, so he contacted Manco to paint the parts; that the parts were shipped to Manco disassembled for paint, and were then returned to AEM after being painted; that, after being returned to AEM, the quality of the paint was not up to specifications, so the mowers were returned to Manco, fully assembled, for touch-up painting; that the mowers were delivered to Manco with the wing decks in the upright position; that he does not know of anyone who spoke to Manco about the process it would use to touch up the paint; that no one from AEM gave instructions to Manco as to how to lower the wings; that, when AEM sold the mowers back to Textron, Textron would sell the mowers to their dealers; that the dealers would then sell *Page 7 
the units to the public; and, that the mowers were not ready to be sold before the paint was touched up because they were not up to specifications.
 {¶ 9} In May 2008, AEM filed a motion for summary judgment pursuant to Civ. R. 56(C), arguing that the Moellers could not prevail on a product liability theory because (1) the mower was not a product; (2) the mower was not placed into the stream of commerce; (3) there was no evidence that the mower was defective, as it did not deviate from specifications, the warnings and instructions were appropriate, the danger was open and obvious to Kevin and his employer, the mower conformed with any representations, and the design was not defective; (4) Manco's superseding/intervening conduct was the proximate cause of Kevin's injuries; and, (5) Kevin's injuries were caused by unforeseeable misuse of the mower. Next, AEM argued that the Moellers could not prevail on a negligence theory because there was no evidence that it breached any duty to Kevin, there was a superseding and intervening proximate cause of Kevin's injuries; and, Kevin assumed the risk of his injury through his unforeseeable misuse of the mower. Finally, AEM argued that, because Kevin's claims could not prevail, Diane's and Bruce's claims for loss of consortium were also invalid, as they were derivative of Kevin's claims.
 {¶ 10} Also in May 2008, Textron filed a motion for summary judgment pursuant to Civ. R. 56(C). Textron argued that the Moellers could not maintain a product liability claim against them because there was no evidence that the mower *Page 8 
was defective; because the mower was substantially modified by Kevin's employer prior to his injury; and, because Kevin knowingly assumed the risk. Textron also argued that the Moellers' negligence claim should fail because Manco proximately caused Kevin's injuries by disconnecting the hydraulic cylinder, releasing the safety latch, and attempting to lower the wing with him standing underneath.
 {¶ 11} In June 2008, the trial court granted Appellees' motions for summary judgment, stating that:
 [The Moellers'] complaint involves a product not yet placed into the stream of commerce but instead was [sic] a product still in production, and was in the possession of [Kevin's] employer who was doing additional work in the process of completing the manufacturing process.
 After a review of all case law submitted, the action by the employee of one of the manufacturing companies involved in producing this final product, before the product was finished, does not set forth sufficient matters to warrant a judgment against [Appellees] arising out of the negligence of [Kevin's] employer in its determination of its processes in completing work on this work in process.
(June 2008 Judgment Entry, p. 1).
 {¶ 12} It is from this judgment that the Moellers appeal, presenting the following assignments of error for our review.
 Assignment of Error No. I THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES AUGLAIZE ERIE MACHINE COMPANY AND THE TEXTRON ENTITIES ON THE *Page 9 APPELLANTS' TORT CLAIMS UNDER THE THEORY OF STRICT LIABILITY IN TORT.
 Assignment of Error No. II THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEE AUGLAIZE ERIE MACHINE COMPANY ON APPELLANT'S TORT CLAIMS UNDER THE THEORY OF NEGLIGENCE.
 Assignment of Error No. III THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO APPELLEES AUGLAIZE ERIE MACHINE COMPANY AND THE TEXTRON ENTITIES ON THE APPELLANTS' DERIVATIVE CLAIMS FOR LOSS OF CONSORTIUM.
 {¶ 13} The following standard of review applies throughout.
 Standard of Review {¶ 14} An appellate court reviews a summary judgment order de novo.Hillyer v. State Farm Mut. Auto. Ins. Co. (1999), 131 Ohio App.3d 172,175. Accordingly, a reviewing court will not reverse an otherwise correct judgment merely because the lower court utilized different or erroneous reasons as the basis for its determination. Diamond Wine Spirits, Inc. v. Dayton Heidelberg Distr. Co., 148 Ohio App.3d 596,2002-Ohio-3932, ¶ 25, citing State ex rel. Cassels v. Dayton City SchoolDist. Bd. of Ed., 69 Ohio St.3d 217, 222, 1994-Ohio-92. Summary judgment is appropriate when, looking at the evidence as a whole: (1) there is no genuine issue as to any material fact; (2) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the *Page 10 
motion for summary judgment is made; and, therefore, (3) the moving party is entitled to judgment as a matter of law. Civ. R. 56(C);Horton v. Harwick Chemical Corp., 73 Ohio St.3d 679, 686-687,1995-Ohio-286. If any doubts exist, the issue must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg, 65 Ohio St.3d 356,358-59, 1992-Ohio-95.
 {¶ 15} The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact. Dresher v. Burt, 75 Ohio St.3d 280, 293,1996-Ohio-107. In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support its argument. Id. at 292. The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings. Id.; Civ. R. 56(E).
 Assignment of Error No. I {¶ 16} In their first assignment of error, the Moellers assert that the trial court erred in granting summary judgment in favor of Appellees under the theory of strict liability in tort. Specifically, the Moellers contend that the mower was a product under R.C. 2307.71(A)(12); that the mower "left the hands" of Appellees; that the mower was defectively designed; that the mower was defective due to an absence of warnings or instructions; that the mower was not substantially modified or altered; that there was no superseding or intervening cause; that *Page 11 
Kevin's conduct was not unforeseeable misuse; that the danger was not open and obvious; and, that Kevin did not voluntarily assume a known risk. We disagree that the mower was a product under R.C. 2307.71(A)(12).
 {¶ 17} In Ohio, a product may be defective as defined by statute due to its manufacture or construction, design, inadequate warnings, or because it does not conform to the manufacturer's representations.Grieshop v. Hoyng, 3d Dist. No. 10-06-27, 2007-Ohio-2861, ¶ 23; R.C. 2307.71 et seq. Plaintiffs seeking redress under the product liability statute must demonstrate that "a defect existed in the product when the defendant manufactured and sold the product; that the defect existed when the product left the defendant's hands; and that the defect proximately caused the plaintiff's injury and/or loss." Id., citingTemple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 321.
 {¶ 18} R.C. 2307.71(A)(12) defines a "product" as:
 [A]ny object, substance, mixture, or raw material that constitutes tangible personal property and that satisfies all of the following:
 (i) It is capable of delivery itself, or as an assembled whole in a mixed or combined state, or as a component or ingredient.
 (ii) It is produced, manufactured, or supplied for introduction into trade or commerce.
 (iii) It is intended for sale or lease to persons for commercial or personal use. *Page 12 
 {¶ 19} Additionally, R.C. 2307.73 governs the standard of proof for manufacturers' liability for compensatory damages and provides that:
 (A) A manufacturer is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, all of the following:
 (1) Subject to division (B) of this section, the manufacturer's product in question was defective in manufacture or construction as described in section 2307.74 of the Revised Code, was defective in design or formulation as described in section 2307.75 of the Revised Code, was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code;
 (2) A defective aspect of the manufacturer's product in question as described in division (A)(1) of this section was a proximate cause of harm for which the claimant seeks to recover compensatory damages;
 (3) The manufacturer designed, formulated, produced, constructed, created, assembled, or rebuilt the actual product that was the cause of harm for which the claimant seeks to recover compensatory damages.
Finally, R.C. 2307.75(A) provides that:
 (B) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section.
(Emphasis added). *Page 13 
 {¶ 20} The product liability statutes and our holding inGrieshop make clear that the product must have left the manufacturer's control in order for the plaintiff to establish a product liability claim. Here, the product designed and assembled by Appellees was sent to a subcontractor, Manco, for touch-up paint at Appellees' direction. Although the mower was not in Appellees' possession, we find that it was still under Appellees' control due to these circumstances. Therefore, the Moellers have not demonstrated the necessary elements to establish a product liability claim and the trial court did not err in granting Appellees summary judgment under the theory of strict liability in tort.
 {¶ 21} Accordingly, we overrule the Moellers' first assignment of error.
 Assignment of Error No. II {¶ 22} In their second assignment of error, the Moellers argue that the trial court erred in granting summary judgment to AEM on the negligence claims. Specifically, the Moellers assert that AEM owed a duty to Kevin because it owned the mower that caused his injuries; that AEM breached its duty of care because the mower was defectively designed and lacked adequate warnings; and, that the mower's defects proximately caused Kevin's injuries. We disagree.
 {¶ 23} Initially, we note that, under the current version of R.C. 2307.71, Ohio's Product Liability Act, parties may no longer pursue common law causes of action for negligent design. R.C. 2307.71(B). However, the current version of R.C. 2307.71, abrogating common law product liability claims, did not become *Page 14 
effective until April 7, 2005. Prior to its enactment, parties could maintain common law actions for negligent product design. See Carrel v.Allied Products Corp. (1997), 78 Ohio St.3d 284, 1997-Ohio-12;Luthman v. Minster Supply Co., 3d Dist. No. 2-06-43, 2008-Ohio-165, ¶ 15. Here, Kevin's injury occurred in January 2004, thus, the Moellers' common law claim for negligent product design is permitted.
 {¶ 24} The elements of a negligence action between private parties are (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury resulting proximately therefrom. Howard v.Chattahoochie's Bar, 175 Ohio App.3d 578, 2008-Ohio-742, ¶ 13, citingNationwide Mut. Ins. Co. v. Am. Heritage Homes Corp.,167 Ohio App.3d 99, 2006-Ohio-2789, ¶ 12.
 {¶ 25} The existence of a legal duty in a negligence action is generally a question of law. Mussivand v. David (1989),45 Ohio St.3d 314, 318. The existence of a legal duty is based upon whether the injury was foreseeable. Federal Steel Wire Corp. v. Ruhlin Constr. Co.
(1989), 45 Ohio St.3d 171, 174. "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act."Covucci v. Syroco, Inc., 6th Dist. No. L-00-1349, 2001 WL 336384, citingMenifee v. Ohio Welding Products, Inc. (1984), 15 Ohio St.3d 75, 77. Consequently, whether Appellees owed a duty to Kevin depends on whether a reasonably prudent person would have anticipated that Kevin would be *Page 15 
injured due to Appellees' alleged negligence in failing to have a "back up system" for lowering the mower wings in the "exigent circumstance" that the hydraulic cylinder and safety latch were disconnected.
 {¶ 26} Here, we find that Appellees could not anticipate a risk of injury to an employee of a subcontractor after that subcontractor disconnected both the safety latch and hydraulic cylinder intended to mechanically lower the wings, and attempted to lower a wing by directing his employee to stand underneath it and manually lower it. SeeCovucci, supra (finding that a manufacturer could not anticipate the injury to a retail store employee who attempted to manually "walk" a stack of chairs weighing between three hundred and fifty to four hundred pounds to a platform). Consequently, the injury to Kevin was not foreseeable, and no question of fact exists on the issue of Appellees' duty to Kevin. Therefore, the trial court did not err in granting summary judgment to Appellees on the Moellers' tort claims under the theory of negligence.
 {¶ 27} Accordingly, we overrule the Moellers' second assignment of error.
 Assignment of Error No. III {¶ 28} In their third assignment of error, the Moellers argue that the trial court erred in granting summary judgment to Appellees on Diane's and Bruce's derivative claims for loss of consortium with Kevin. Specifically, the Moellers urge this Court to hold that parents of an adult child may assert a claim for loss of consortium with that child. *Page 16 
 {¶ 29} Diane's and Bruce's claims for loss of consortium are derivative of Kevin's claims under the theories of strict liability in tort and negligence. As we found in our disposition of the first and second assignments of error, Kevin lacks a valid claim under either theory. Consequently, Diane's and Bruce's claims for loss of consortium also fail. See McClary v. M/I Schottenstein Homes, Inc., 10th Dist. No. 03AP-777, 2004-Ohio-7047, ¶¶ 62-64.
 {¶ 30} Accordingly, we overrule the Moellers' third assignment of error.
 {¶ 31} Having found no error prejudicial to Appellants herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed
 PRESTON, P.J., and SHAW, J., concur. *Page 1